# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 16, 2024

Lyle W. Cayce
Clerk

———————

No. 22-10942

———————

Southwest Airlines Company,

*Plaintiff—Appellant*,

*versus*

Liberty Insurance Underwriters, Incorporated,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-2218

———————————————————

Before Graves, Higginson, and Ho, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:

Defendant Liberty Insurance Underwriters denied Plaintiff Southwest Airlines's claim for reimbursement under its cyber risk insurance policy for costs related to a computer system failure. The district court granted summary judgment for Liberty, concluding that those costs were purely discretionary and therefore either not covered under the policy's insuring clause or barred by the policy's exclusions. We conclude that the costs are not categorically barred from coverage as a matter of law, and

No. 22-10942

accordingly we REVERSE and REMAND for proceedings consistent with our opinion.[1]

## I. BACKGROUND

On July 20, 2016, Southwest suffered a massive computer failure, which resulted in a three-day disruption of its flight schedule. During the disruption, approximately 475,839 Southwest customers experienced either a flight cancelation or a delay of two hours or more.

Just weeks earlier, Southwest had purchased a so-called cyber risk insurance policy from non-party AIG, Inc. The policy included a provision for "System Failure Coverage" providing that the insurer "shall pay all Loss . . . that an Insured incurs . . . solely as a result of a System Failure . . . ." Southwest also purchased a series of follow form excess policies, including one from Liberty. Under the Liberty policy, the company provided excess coverage under the terms of AIG's cyber risk policy for up to $10 million in losses. The excess policy positioned Liberty above three other excess insurers and AIG. Liberty's coverage was only implicated if Southwest's system-failure-related losses exceeded $50 million.

Southwest calculated that it ultimately incurred more than $77 million in losses as a result of the system failure and resulting flight disruptions. To recoup those losses, it began climbing the cyber risk insurance tower, and, by March 2018, it had collected $50 million from AIG and the other insurers on the first three tiers. When it reached Liberty, however, its claim was denied. Liberty challenged five categories of Southwest's claimed losses, without

---

[1] Judge Ho would certify the question presented regarding consequential damages to the Texas Supreme Court. *See, e.g.*, *JCB, Inc. v. The Horsburgh & Scott Co.*, 941 F.3d 144, 145 (5th Cir. 2019).

No. 22-10942

which its covered losses would total less than $50 million and therefore would not trigger the Liberty policy:

- **FareSaver Promo codes**, constituting $16,563,656.00 in costs. FareSaver Promo codes are 50% discount codes; each code is redeemable for up to eight passengers. The codes were disbursed to customers whose flights were canceled or delayed two hours or more.
- **Travel vouchers**, constituting $6,644,801.00 in costs. Southwest issued such vouchers for specific dollar amounts and disbursed to customers whose flights were canceled or delayed two hours or more.
- **Cover Refunds**, constituting $7,366,000.00 in costs. Cover Refunds are reimbursements made by customer service agents to customers upon request to compensate for alternate travel arrangements, such as buses, rental cars, and hotels.
- **Rapid Rewards Points**, constituting $3,561,363.00 in costs. Rapid Rewards Points are redeemable for airline tickets and were distributed to members of its frequent flier program whose flights were canceled or delayed two hours or more.
- **Advertising costs**, constituting $1,217,921.00 in costs. Southwest was conducting a sale at the time of the system failure, and, as a result of it, extended the sale for a week.

On September 16, 2019, Southwest sued Liberty for breach of contract, bad faith, and declaratory judgment on the issue of coverage. Liberty moved for summary judgment, arguing that Southwest's claims failed due to the lack of coverage under the System Failure Coverage

No. 22-10942

provision, or, alternatively, due to the operation of three exclusions in the policy[2]. Southwest filed a cross-motion for partial summary judgment.

On September 6, 2022, the district court issued a terse order granting Liberty's motion. The district court's analysis on the central issue in this appeal was contained in a footnote, in which it concluded that Southwest's costs were not caused by the system failure but rather were the result of "various and purely discretionary customer-related rewards programs, practices and market promotions." It also concluded that coverage was barred under the policy exclusions and that Southwest's bad faith claims failed by operation of law and on the merits. Finally, it denied Southwest's motion for partial summary judgment. Southwest appealed.

## II. STANDARD OF REVIEW

The standard of review on summary judgment is *de novo*. *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018). Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *Id*. (quoting Fed. R. Civ. P. 56(a)). This court "may affirm [summary judgment] on any grounds supported by the record." *McGruder v. Will*, 204 F.3d 220, 222 (5th Cir. 2000).

Texas law applies to the Liberty policy. *See* Tex. Ins. Code Ann. art. 21.42. "In Texas, the construction of a contract presents a question of law." *Balfour Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co.*, 968 F.3d 504, 509 (5th Cir. 2020) (citations omitted).

## III. DISCUSSION

### a. The coverage provision

---

[2] Only two of those exclusions are at issue on appeal.

As set forth above, the policy's System Failure Coverage provision covers "all Loss . . . that an Insured incurs . . . solely as a result of a System Failure . . . ." Liberty argues that all five categories of costs that Southwest claimed were not incurred solely as a result of the system failure but rather were the result of Southwest's subsequent business decisions. Southwest acknowledges that those costs were the result of business decisions but argues that, under the plain terms of the policy, they are covered.

In Texas, interpretation of an insurance policy begins with its actual words, "because it is 'presume[d] parties intend what the words of their contract say.'" *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 454 (5th Cir. 2022) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)). Because we must determine whether the five categories of costs were losses incurred solely as a result of the system failure, our inquiry requires us to determine the meaning of the terms "Loss"; "incur"; and "sole cause."

When a policy defines a term, we use that definition; otherwise, we endeavor to find the term's "ordinary and generally-accepted meaning." *Terry Black's*, 22 F.4th at 455 (citing *Gilbert*, 327 S.W.3d at 126). Texas law requires us to begin that inquiry with the dictionary. *Cooper Indus. Ltd. v. Nat'l Union Fire Ins. Co. Pittsburgh*, 876 F.3d 119, 128 (5th Cir. 2017) (citation omitted). We then look to "the term's usage in other statutes, court decisions, and similar authorities." *Pharr-San Juan-Alamo Indep. Sch. Dist. v. Texas Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022).

Here, the policy defines "losses" to mean, as relevant, "costs that would not have been incurred but for a Material Interruption." It defines Material Interruption as "the actual and measurable interruption or suspension of an Insured's business directly caused by . . . a System Failure."

We therefore conclude that Southwest's five categories of costs satisfy that lenient but-for causation standard and are therefore "losses."

The policy does not define "incur" but the Texas Supreme Court has done our work for us here, relying on dictionaries to define "incur" to mean to "become[] liable for," *Garcia v. Gomez*, 319 S.W.3d 638, 642 n.4 (Tex. 2010) (citing Webster's Ninth New Collegiate Dictionary 611 (1984) and *Incur*, Black's Law Dictionary *771* (7th ed.1999) ("to suffer or bring on oneself (a liability or expense)")). Another dictionary similarly defines "incur" as "to become liable or subject to" or to "bring down upon oneself." *Incur*, merriam-webster.com, https://www.merriam-webster.com/dictionary/incur (last visited Dec. 12, 2023). Because Southwest's five categories of costs were ones that Southwest brought upon itself, we therefore conclude that they were "losses" that it "incurred."

The policy does not define "solely." According to the Texas Supreme Court, also relying on a dictionary, the word means "'to the exclusion of all else'" and "'without another.'" *Northland Indus. v. Kouba*, 620 S.W.3d 411, 416 (Tex. 2020) (citing Webster's Ninth New Collegiate Dictionary (1984); Webster's Third New Int'l Dictionary (2002)). But that definition, standing alone, does not resolve the question. Namely, it does not tell us whether "to the exclusion of all else" means there can be no intermediate causes—such as a discretionary decision—or whether it only means there can be no other originating or precipitating causes.

We look to Texas law for more clarity. *See Pharr*, 642 S.W.3d at 474. The parties concede that there are no cases directly on point in the context of business interruption insurance. Oral Arg. at 04:19–04:23; 34:04–34:28, https://www.ca5.uscourts.gov/OralArgRecordings/22/22-10942_10-4-2023.mp3. But the policy at issue is hardly the first time the words "sole" or

"solely" have been used in a Texas insurance policy with regard to causation. In *Wright v. Western Southern Life Insurance Company*, for example, an injury policy covered "the loss of a foot 'solely as a result of accidental bodily injury sustained or disease . . . .'" 443 S.W.2d 790, 790 (Tex. App.—Eastland 1969, no writ). The insured claimed that gangrene was the sole cause of the loss of his foot. *See id.* at 790-91. In interpreting the policy, the Court of Civil Appeals explained that a "sole" cause is one independent of any other cause, applying the Texas Supreme Court's decision in *Mutual Benefit Health & Accident Association v. Hudman*, 398 S.W.2d 110 (Tex. 1965)). Accordingly, the court held that gangrene was not the *sole* cause of the loss because it was not the *independent* cause; rather, the sole cause was an earlier gunshot, which alone precipitated the gangrene infection and ultimately the amputation of the plaintiff's foot. *Wright*, 443 S.W.2d at 790–92.

Much more recently, we applied that same definition of sole cause to a Texas life insurance policy that paid out only when a bodily injury was the "sole cause" of death. *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 888 (5th Cir. 2018); *see also id.* at 892–93. Like the court in *Wright*, we equated sole cause to independent cause. *Id.* at 892. Applying that definition, we concluded that an injury is still the sole cause of death even if death resulted more directly from complications like septic shock or multi-system organ failure. *Id.* at 893–94. We explained that those complications were not independent causes but rather were caused by the original injury. *Id.* In turn, the complications did not "strip the [original injury] of its 'sole proximate cause' status." *Id.* at 894.

Here, Liberty argues that the system failure cannot be the sole cause of Southwest's claimed costs because the "independent" and "more direct" cause of those losses was Southwest's decision to incur them. But those decisions can only be independent, sole causes of the costs if they were the *precipitating* causes of the costs. The decisions, like the infection in *Wright* or

the medical complications in *Wells*, were not precipitating causes that competed with the system failure, but links in a causal chain that led back to the system failure.

To be clear, this inquiry only shows that the district court erred in concluding that Southwest's five categories of costs were all precluded as a matter of law because they were discretionary. We do not determine whether the system failure was in fact the sole cause of each of the costs that Southwest claims.

To that end, Liberty argues that if Southwest's covered losses include discretionary costs, Southwest could "literally dictate the amount of its own 'loss.'" But that would only be true if no causation standard applied at all. The policy still requires a causal nexus between the system failure and Southwest's costs. Indeed, it even contains a provision to guide that causation inquiry, limiting coverage to only the costs that are deemed appropriate based on Southwest's "probable business" if no system failure occurred.

Likewise, basic insurance principles still apply. The general purpose of business interruption insurance is "to compensate an insured for losses stemming from an interruption of normal business operations . . . thus preserving the continuity of the insured's business earnings *by placing the insured in the position that it would have occupied if there had been no interruption.*" 11A Couch on Ins. § 167:9 (3d ed. 2023) (emphasis added).[3] And as with any other contract, "the general duty to mitigate

---

[3] Liberty's objection that this analysis is inapposite due to the treatise's specific discussion of "damage or destruction of property from a covered hazard" does not convince us that the overall purpose behind business interruption insurance arising from physical damage is not analogous to the overall purpose behind business interruption insurance arising from system failure.

damages may come into play as a factor in construing policy coverage terms." *Id.* at § 168:15. Under those principles, costs that Southwest incurred for mitigation may be recoverable, but recovery that would put Southwest in a *better position* than it would have occupied without the interruption would seem to be beyond the scope.

To ultimately resolve the coverage question, it will be essential to consider the extent to which recovery for each category of loss at issue comports with those principles. Liberty would need to explain how the cover refunds in particular would not qualify as recoverable mitigation costs that arose solely as a result of the system failure; just as Southwest would need to explain how its claims for a week of advertising (for a single-day interruption of its ad campaign) and for FareSaver Promo codes (which potentially allowed redemption for those who were not impacted by the cancelations) would not grant the company a windfall.

Ultimately, the question of the exact costs to which Southwest is entitled is not before this court, because the district court did not reach it. We conclude only that the district court should not have granted summary judgment as a matter of law on the basis of the policy's main insuring provision.

### b. The policy exclusions

Next, Liberty argues that even if Southwest's claimed costs are covered, they are barred by two policy exclusions. The district court agreed and granted summary judgment on that alternative basis as well.

The first of those exclusions, Exclusion SF(b), provides that Liberty is not liable for "any Loss . . . alleging, arising out of, based upon or attributable to contractual penalties or consequential damages." The parties agree that whether the exclusion applies here boils down to how we interpret the words "consequential damages."

Generally, we "adopt[] the ordinary meaning of words and terms as they are commonly understood by the average laymen in preference to a technical meaning as understood by members of a profession . . . " *Wells*, 885 F.3d at 890. But the parties essentially agree that "consequential damages" is a legal term that is not particularly susceptible to a "layman" interpretation. Liberty's proffered definition of "consequential damages"— any costs that "do not flow directly and immediately from the act"—is ultimately sourced from Black's Law Dictionary. *See*, *e.g.*, *PHI, Inc. v. Apical Indus.*, 946 F.3d 772, 775 n.5 (5th Cir. 2020) (citing *Damages*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Southwest argues that the phrase is a legal term of art and refers to the type of harms that flow "naturally, but not necessarily, from the defendant's breach and are not the usual result of the wrong." *See James Constr. Grp., L.L.C. v. Westlake Chem. Corp.*, 650 S.W.3d 392, 417 n.25 (Tex. 2022) (citations and internal quotation marks omitted). For instance, Southwest's definition would include as consequential damages—and thus exclude coverage for—costs Southwest would incur if it were sued by a passenger claiming that her canceled flight caused her to miss a lucrative business opportunity.

To resolve the disagreement, we first turn to some basic principles concerning policy structure. First, we acknowledge that a policy's main insuring clause sets the boundaries of coverage while its exclusions "subtract" from that coverage. *Columbia Cas. Co. v. Georgia & Florida RailNet, Inc.*, 542 F.3d 106, 112 (5th Cir. 2008) (applying Texas law). But we are also mindful that we must "harmonize and give effect to all provisions so that none will be meaningless," *Gilbert*, 327 S.W.3d at 126 (citation omitted), and that we should avoid interpretations that "would render coverage under the endorsement largely illusory," *ATOFINA Petrochemicals, Inc. v. Continental Cas. Co.*, 185 S.W.3d 440, 444 (Tex. 2005).

Together, those principles favor Southwest's interpretation. Under Liberty's definition of consequential damages, the policy would exclude coverage for any costs that are not "direct" and "immediate," and as Liberty would have it, is so narrow that in practice it may not cover much beyond, for example, the cost of technical repairs to Southwest's computer systems. Indeed, that interpretation would effectively wipe out entire portions of the policy. For one thing, it would seem to preclude costs incurred as a result of a decision to mitigate damages from the system failure, even though, as we explained above, the System Failure Coverage provision permits such costs in principle. It would also outright negate other provisions, such as one that covers Southwest's lost income for up to 120 days and another that covers the cost of fines and penalties assessed against Southwest by civil authorities.

Liberty's definition of consequential damages would do much more than "subtract" from coverage; it would render much of the coverage under the policy completely illusory. Because of this, and because Southwest's construction is "not unreasonable," *id.*, we must adopt Southwest's interpretation instead. We therefore conclude that the district court erred in determining that the five categories of costs are consequential damages excluded from coverage.

The second exclusion at issue, Exclusion 3(i)(1), provides that Liberty will not pay for "any Loss . . . arising out of, based upon or attributable to . . . any liability to third-parties for whatever reason . . . ." Liberty interprets the term "third-parties" to include Southwest's customers and therefore argues that the exclusion applies to any payments to customers, such as refunds; payments for lost, damaged, or delayed luggage; and refunds for alternative travel arrangements.

The dictionary defines "third party" as "a person other than the principals." *Third party*, MERRIAM-WEBSTER.COM,

https://www.merriam-webster.com/dictionary/third%20party (last visited Dec. 12, 2023). It defines "liability" as, *inter alia*, a "pecuniary obligation." *Liability*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/third%20party (last visited Dec. 12, 2023). While those definitions generally favor Liberty, the court must still interpret the policy in a way that "harmonizes" its provisions. *Gilbert*, 327 S.W.3d at 126. And Liberty's broad definition of "third party" would effectively wipe out provisions in the policy that explicitly cover other "pecuniary obligations" to "a person other than the principals," including provisions covering Southwest's payroll obligations to its employees, and fines owed to regulators. *See ATOFINA*, 185 S.W.3d at 444.[4] The term "third parties" therefore does not apply to Southwest's customers and, in turn, does not preclude costs related to Southwest's payments to its customers. Consequently, the district court erred in granting summary judgment on that basis as well.

### c. Southwest's extra-contractual claims

The district court granted summary judgment to Liberty as to Southwest's bad faith claim on the basis that Southwest's five categories of costs were barred from coverage, and alternatively, because it concluded that there was a bona fide dispute between the parties as to coverage. Because we conclude that Southwest's costs are not barred as a matter of law, only the district court's second basis remains for us to consider.

---

[4] Another provision requires losses to "be reduced by any amounts recovered by an Insured . . . from any third party . . . ." If we applied Liberty's definition of "third party" consistently throughout the policy, that provision would become absurd, because it would imply that Southwest is able to recover "amounts" from its own customers for losses stemming from system interruptions.

For any of its claimed costs, Southwest, to survive summary judgment on its bad faith claim, must make a prima facie case that Liberty "knew or should have known that it was reasonably clear that [Southwest's claim was] covered" but denied the claim anyway. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 49 (Tex. 1997). Southwest must show "the *absence* of a reasonable basis to deny the claim," *id*. at 51, or, put differently, the absence of a bona fide dispute as to coverage, *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997).

Liberty submitted evidence showing that Southwest's executives expected its insurance claims to meet opposition from insurers. In turn, Southwest submitted evidence showing that Liberty insistently pursued the argument—which Southwest calls "preposterous"—that the system failure and business interruption were not the "but for" cause of four of the five categories of loss now in dispute. It is not clear from the district court's order how it viewed that evidence. Regardless, we conclude that Southwest satisfied its burden of showing that a genuine dispute of material fact exists as to whether Liberty had a reasonable basis to deny Southwest's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Consequently, the district court also erred in granting summary judgment on that basis.

The district court made no mention of another aspect of Southwest's bad faith claim, which is based on Texas Insurance Code section 542.060 and concerns Liberty's alleged failure to promptly respond to Southwest's insurance claim. Because the district court did not address the issue, we remand it for consideration in the first instance.

### d. Southwest's cross-motion

Finally, Southwest sought partial summary judgment on the issue of whether its costs satisfied the "but for" causation standard. The district court denied the motion without analysis, though we assume that the reason

was mootness. Because the motion is not moot, it is also remanded for consideration in the first instance.

## IV. CONCLUSION

The district court's order granting summary judgment is REVERSED and the matter is REMANDED for proceedings consistent with our opinion.