REVISED SEPTEMBER 28, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-31032

ANGELA SMITH, in Her Own Rights, and as Representative of
her husband's estate and on behalf of her minor child, on behalf
of D'Angela Noel Smith

Plaintiff-Appellee

v.

AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS

Defendant-Appellant

Appeal from the United States United States District Court
for the Western District of Louisiana

Before GARWOOD, OWEN, and SOUTHWICK, Circuit Judges.

GARWOOD, Circuit Judge:

After her husband's death in a helicopter crash, plaintiff-appellee, Angela Smith (Mrs. Smith), in her own right and as representative of her husband's estate and on behalf of her minor child, sued defendant-appellant, the American Family Life Assurance Company of Columbus (Aflac), seeking to recover sums allegedly owed under the terms of an accident insurance policy issued by Aflac. Both parties moved for summary judgment. The district court granted Mrs. Smith's motion, denied Aflac's motion, and entered judgment in favor of Mrs. Smith. Aflac now appeals both the judgment in

favor of Mrs. Smith and the denial of its motion for summary judgment. For the following reasons, we reverse.

## FACTS AND PROCEEDINGS BELOW

Mrs. Smith's husband, Darrel Smith (Mr. Smith), was an employee of Island Operating Company, Inc. (Island). The Apache Corporation (Apache) provided oilfield services to Island. On March 14, 2006, Mr. Smith boarded a helicopter in Patterson, Louisiana, that had been chartered by Apache to transport him and several other employees to an offshore platform in the Gulf of Mexico. The helicopter crashed shortly after takeoff, and he was burned to death when the wreckage caught fire.

At the time of her husband's death, Mrs. Smith was the insured under an accident insurance policy that she had purchased from Aflac. The policy's effective date was May 20, 2004. It provided for a two-tiered lump sum benefit in the event of the accidental death of the insured's spouse. If the insured's spouse died in a "Common-Carrier Accident," the insured was entitled to a benefit of $150,000. But if the insured's spouse died in an "Other Accident," then the insured was only entitled to a benefit of $40,000. "Common-Carrier Accidents" were defined as:

> "accidents that occur on or after the Effective Date of coverage and while coverage is in force directly involving a vehicle in which a covered person is a passenger at the time of the accident and which is duly licensed by a proper authority to transport passengers for a fee. Common-carrier vehicles are limited to airplanes, trains, buses, trolleys, and boats that operate on a regularly scheduled basis between predetermined points or cities. A taxi is not a common-carrier vehicle." (Emphasis in original.)

"Other Accidents" were defined as:

2

"accidents that occur on or after the Effective Date of coverage and while coverage is in force that are not classified as Common-Carrier Accidents and that are not specifically excluded in the Limitations and Exclusions section."

The "Limitations and Exclusions" section of the policy provided that:

"[Aflac] will not pay benefits for an accident or Sickness that is caused by or occurs as a result of a covered person's:

. . .

9.    Participating in any form of flight aviation other than as a fare-paying passenger in a fully licensed, passenger-carrying aircraft."

The helicopter that crashed with Mr. Smith on board was owned and operated by Rotorcraft Leasing Company, LLC (Rotorcraft). Rotorcraft had conducted the flight pursuant to a contract between it and Apache that provided for Apache, from time to time at Apache's discretion, to request of Rotorcraft chartered helicopter transport for workers to offshore platforms in the Gulf as needed. These chartered helicopter flights were operated under an "FAR 135" certification from the Federal Aviation Administration (FAA). "FAR 135" stands for "Federal Aviation Regulations Part 135," which governs "commuter or on-demand operations." See 14 C.F.R. § 135.1(a) (2009). According to a report concerning the accident made by the National Transportation Safety Board (NTSB), the flight was operated under an "On-demand Air Taxi" certificate. The NTSB report also described the type of flight as "Non-scheduled."

On April 10, 2006, Mrs. Smith signed a "PROOF OF DEATH - BENEFICIARY'S STATEMENT" verifying her husband's death and submitted it to Aflac. On May 23, 2006, Aflac paid Mrs. Smith $40,000 after determining that the accident was an "Other Accident" under the terms of the policy. Aflac refused to classify the accident as a "Common-Carrier Accident,"

3

because it stated that the helicopter had not been an airplane, train, bus, trolley, or boat that operated on a regularly scheduled basis between predetermined points or cities.

Mrs. Smith sued Aflac, seeking $110,000 in additional benefits, as well as attorneys' fees and penalties under LA. REV. STAT. ANN. § 22:1821(B)[1] on the ground that Aflac had acted in bad faith by refusing to classify her husband's accident as a "Common-Carrier Accident." Mrs. Smith initiated her action against Aflac by amending the petition of her suit against Rotorcraft and several other defendants that was already underway in Louisiana state court. Aflac removed the suit to federal court based on diversity jurisdiction and then successfully moved to sever all claims against Rotorcraft and the other defendants.[2]

Aflac then moved for summary judgment to dismiss Mrs. Smith's claims on the ground that the helicopter crash could not qualify as a "Common-Carrier Accident" under the terms of the policy, because a helicopter was not an airplane. Aflac also moved for partial summary judgment to dismiss Mrs. Smith's claims for penalties and attorneys' fees on the ground that there was no evidence that Aflac had acted in bad faith by denying her request for additional benefits. Mrs. Smith opposed both of Aflac's motions and filed a cross-motion for summary judgment, arguing that the language of the policy was ambiguous and therefore had to be interpreted in favor of the policyholder under established principles of Louisiana law. Aflac filed a response to this motion in which it reasserted that a helicopter was not an

---

[1] Formerly LA. REV. STAT. ANN. § 22:657(B). The Louisiana legislature renumbered its Insurance Code effective January 1, 2009. 2008 La. Sess. Law Serv. 665 (West).

[2] The claims against Rotorcraft and the other defendants were subsequently remanded to state court.

4

airplane and added that, even if "airplane" were interpreted to include helicopters, Mr. Smith's helicopter could not have been a "common-carrier vehicle," under the policy because its flight had not been "regularly scheduled . . . between predetermined points or cities." Aflac had not previously raised this not "regularly scheduled" argument, so Mrs. Smith requested a continuance to conduct additional discovery on the issue. The district court granted her request, but there is no indication that Mrs. Smith ever conducted any discovery on this issue. Aflac asserts that she did not, and Mrs. Smith does not deny that assertion.

On September 29, 2008, the district court issued a memorandum ruling granting Mrs. Smith's cross-motion for summary judgment and denying Aflac's motion for summary judgment. The memorandum ruling also granted Aflac's motion for partial summary judgment and dismissed Mrs. Smith's claim for statutory penalties and attorney's fees. In accordance with its memorandum ruling the district court entered a separate judgment without specifying the monetary relief. Aflac reserved its rights to appeal and moved to amend the judgment, asking the court to correct a typographical error and to enter a final monetary judgment. On October 17, 2008, the district court entered an amended judgment accordingly, rendering judgment that Mrs. Smith recover $110,000, and prejudgment interest, from Aflac. Aflac timely filed a notice of appeal. Mrs. Smith did not appeal the dismissal of her claims for statutory penalties and attorneys' fees.

## DISCUSSION

The sole issue before this panel is whether or not the district court erred when it granted summary judgment on Mrs. Smith's cross motion and denied Aflac's motion for summary judgment. The issue is one of pure contract interpretation. There are no contested facts, and the law in this area

5

is well-defined.

## I. Standard of Review

The grant or denial of a motion for summary judgment is reviewed de novo. E.g., Robinson v. Orient Marine Co., 505 F.3d 364, 366 (5th Cir. 1999). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quoting FED. R. CIV. P. 56(c)). Interpretation of an insurance contract generally involves a question of law. In re Katrina Canal Breaches Litig., 495 F.3d 191, 206 (5th Cir. 2007) (citing Bonin v. Westport Ins. Corp., 930 So.2d 906, 910 (La. 2006)). Whether or not ambiguity exists in an insurance policy is also a question of law. Am. Marine Underwriters, Inc. v. Holloway, 826 F.2d 1454, 1456 (5th Cir. 1987).

## II. Principles of Louisiana Insurance Law

The parties agree that Louisiana law governs the interpretation of Mrs. Smith's insurance policy. Under Louisiana law, an insurance policy is a contract between the parties and should be interpreted according to the general rules of interpretation of contracts prescribed in the Louisiana Civil Code. Katrina Canal Breaches, 495 F.3d at 206.

An insurance contract must be construed according to the entirety of its terms and conditions as set forth in the policy. LA. REV. STAT. ANN. § 22:881 (2009).[3] "The words of a contract must be given their generally prevailing meaning." LA. CIV. CODE ANN. art. 2047 (2008). When the words of a contract are clear and explicit and lead to no absurd consequences, no further

---

[3] Formerly LA. REV. STAT. ANN. § 22:654.

interpretation may be made in search of the parties' intent. LA. CIV. CODE ANN. art. 2046 (2008).

Where a contract is ambiguous, the ambiguity may be resolved using either one of two methods. See Katrina Canal Breaches, 495 F.3d at 207 (citing La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La. 1994)). The first method is to construe the ambiguous provisions in light of the contract as a whole, interpreting words that are susceptible of different meanings as having the meaning that best conforms to the object of the contract. Katrina Canal Breaches, 495 F.3d at 207. The second method is to ascertain how a reasonable insurance policy purchaser would have construed the clause at the time the contract was entered into. Id.

If, after applying both of these methods, an ambiguity remains, then the ambiguous contractual provision should be construed strictly against its drafter. Id. In the insurance context, this means that the ambiguous provision is to be construed in favor of the insured. Id. This is known as the "rule of strict construction." See id. However, an insurance contract should not be construed in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by its unambiguous terms or to achieve an absurd conclusion. Id.

## III. The District Court's Reasoning

The district court examined Mrs. Smith's policy and concluded that its definition of "Common-Carrier Accidents" was ambiguous when applied to the facts of this case.

> "Because Aflac added the statement that a taxi, an unlisted vehicle, is not included as a 'common-carrier vehicle', the provision implies that the list is non-exhaustive or illustrative rather than limited to the five listed vehicles. Moreover, Aflac,

7

the drafter of the provision, chose to specify only that 'a taxi' was excluded as a common-carrier vehicle and failed to make any mention of a helicopter."

The district court proceeded to try to solve the ambiguity it had found by reading the contract as a whole. The district court found that reading the contract as a whole only compounded the ambiguity it had found in the definition of "common-carrier vehicles," because the "Limitations and Exclusions" section of the contract used the broad term "aircraft," which both parties agreed included helicopters.

The district court next tried to resolve the ambiguity by ascertaining how a reasonable insurance policy purchaser would have construed the clause. It noted that Mrs. Smith claimed that she and her husband had thought helicopter travel was covered by the policy. But the district court stated that the reasonable expectations doctrine was not applicable, because Mrs. Smith had offered no evidence that she or her husband had discussed their subjective expectations with Aflac.[4]

Having attempted to apply both methods for resolving ambiguity without avail, the district court invoked the rule of strict construction and held that the definition of "Common-Carrier Accidents" included Mr. Smith's helicopter crash. The district court did not address the policy's requirement that "[c]ommon-carrier vehicles are limited to" those "that operate on a regularly scheduled basis between predetermined points or cities."

On appeal, Aflac argues that the district court erred in reaching this

[4] The district court did not explain how Mrs. Smith's failure to inform Aflac of her subjective expectations was in any way relevant to determining what the objective expectations of a reasonable insurance policy purchaser would have been. However, because we find that the language of Mrs. Smith's policy was not ambiguous as applied to her husband's helicopter flight, we do not need to reach this component of the district court's reasoning on review.

8

result for six reasons. Aflac's first argument is that the word "airplanes" does not include helicopters. Therefore, Aflac argues, a helicopter cannot constitute a "common-carrier vehicle" within the meaning of the policy. Aflac's second argument is that the helicopter in this case was not "regularly scheduled . . . between predetermined points or cities." Aflac's third argument is that the mention of "taxi" did not make the policy ambiguous, because "taxi" is a broad word that can include "air taxis." Aflac's fourth argument is that the mention of "taxi" did not make the policy ambiguous, because superfluous exceptions in contracts are common and provide a weak inference at best as to the provision's meaning. See generally Williamson v. J.C. Penney Life Ins. Co., 226 F.3d 408, 411 (5th Cir. 2000). Aflac's fifth argument is that the strict construction principle is only supposed to be applied to exclusionary provisions. Aflac argues that there was no exclusionary provision at issue in this case, since Mrs. Smith still recovered benefits under the "Other Accidents" provision in her policy. Aflac's sixth and final argument is that the district court failed to interpret the insurance policy as a whole by using its overall structure to create ambiguity rather than to resolve it.

IV. Analysis

We agree with Aflac that the district court erred in holding that the helicopter accident that killed Mr. Smith was a "Common-Carrier Accident." We need not reach the issue of whether the mention of "taxi" in connection with the definition of "Common-Carrier Accidents" rendered that definition ambiguous in respect to whether it could include helicopters, nor must we decide whether a helicopter can be a type of airplane, because Mrs. Smith failed to produce any evidence that her husband's helicopter had operated on a regularly scheduled basis between predetermined points or cities. The

9

definition's "regularly scheduled" requirement was not ambiguous, and Mrs. Smith failed to satisfy it. Because we do not find that the policy was ambiguous as applied to Mrs. Smith's claim, we also decline to reach the issues of whether the district court correctly read the policy as a whole and whether the rule of strict construction can be applied to provisions that are not exclusionary.

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). Under Louisiana law, the insured has the burden of proving that his claim is covered by the policy at issue. E.g., Dickerson v. Lexington Ins. Co., 556 F.3d 290, 295 (5th Cir. 2009). "On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy." Doerr v. Mobil Oil Corp., 774 So.2d 119, 124 (La. 2000). In the insurance context, an "exclusion" is a "provision that excepts certain events or conditions from coverage." Black's Law Dictionary (8th ed. 2004). The "Common-Carrier Accident" provision in Mrs. Smith's policy did not except her from coverage. She recovered $40,000 for her husband's death, because Aflac determined that her claim was covered as an "Other Accident." Therefore, the "Common-Carrier Accident" definition was not an exclusion, and Mrs. Smith bore the burden of proving that her claim should have been classified as a "Common-Carrier Accident."

There was no evidence before the district court on Aflac's motion for summary judgment that tended to establish that Mr. Smith's flight had been regularly scheduled between predetermined points or cities. The helicopter

10

had been operated under an "FAR 135" certification from the Federal Aviation Administration (FAA).[5] "FAR 135" stands for "Federal Aviation Regulations Part 135," which governs "commuter and on-demand operations." See 14 C.F.R. § 135.1(a) (2009). According to a report made concerning the accident by the National Transportation Safety Board (NTSB), the flight was operated under an "On-demand Air Taxi" certificate. The NTSB report also described the type of flight as "Non-scheduled."

That Rotorcraft operated its flights for Apache under an "on-demand" certificate from the FAA may not automatically require the conclusion that these flights were in fact made "on-demand." The possibility might arguably remain that Rotorcraft and Apache could have regularly scheduled flights that were nevertheless operated under an "on-demand" FAA certificate. However, the fact that Mr. Smith's flight was operated under an "on-demand" certificate did constitute some evidence before the district court on summary judgment that suggested that Mr. Smith's flight was not regularly scheduled. Several courts in other jurisdictions have found that language similar to the "regularly scheduled" requirement in Mrs. Smith's policy does not include on-demand flights or air taxi services. See Fosse v. Allianz Life Ins. Co., No. CIV. A. 93-1110, 1994 WL 139413, at *2-3 (E.D. Pa. Apr. 20, 1994) (mem. op.) (holding that a "regular scheduled" trip within the meaning of the insurance policy at issue is one that the air carrier conducts "pursuant to a set schedule with fixed times," not a flight operated on-demand or as an air taxi); Frizzell v. Stonebridge Life Ins. Co., No. A03-155 CV JWS, 2004 WL 2786140, at *3

---

[5] We note the flight's FAA certification merely as evidence that was before the district court on Aflac's motion for summary judgment that was relevant to the issue of whether or not Mr. Smith's flight had been "regularly scheduled." We do not hold that FAA regulations are (or are not) necessarily relevant to or ultimately determinative in interpreting the meaning of an insurance policy that does not invoke them.

11

(D. Alaska Oct. 25, 2004) (holding that, "Because the helicopter was operated on-demand, with the departure date [and] time determined 'on an as needed basis,' the helicopter was not operated with a definite regular schedule of departures and arrivals, and consequently does not qualify as a 'Common Carrier' under the Policy"); McBride v. Prudential Ins. Co., 72 N.E.2d 98, 99-100 (Ohio 1947) (holding that a commercial airplane chartered for hire to transport a passenger on a hunting trip was not a "regularly scheduled passenger flight" within the meaning of the insurance policy at issue, because "regularly scheduled passenger flight" meant "trips regularly scheduled as to [the] time of departure and arrival by commercial airlines operating between definitely established airports"). While we are not bound by any of these decisions, we find their reasoning persuasive. A flight made on-demand is ordinarily the antithesis of a "regularly scheduled" one. The fact that Mr. Smith's flight was operated under an "on-demand" certificate from the FAA suggests that it was an on-demand flight. Mrs. Smith needed to make a showing that, despite its FAA certificate, her husband's flight was "regularly scheduled . . . between predetermined points or cities."

In her brief, Mrs. Smith argues that her husband's flight was "regularly scheduled" in the sense that such flights were likely frequently requested by Apache, as evidenced by the terms of its Helicopter Service Agreement (Service Agreement) with Rotorcraft. She also argues that her husband's flight was between predetermined points, because the flight was between a predetermined point on land and a predetermined point on an offshore rig, even if those points were only determined minutes prior to takeoff.

We find Mrs. Smith's arguments unpersuasive, because they render the language about "predetermined points or cities" essentially meaningless, and because they are not supported by the terms of the Service Agreement.

12

Under Mrs. Smith's reading of "predetermined points," the only way a commercial flight could fail to satisfy the terms of the policy's definition would be for its pilot to take off literally not knowing where he was going to land. Under Louisiana law, the words of a contract are to be given their generally prevailing meaning. LA. CIV. CODE ANN. art. 2047 (2008). The indisputably more natural reading of "regularly scheduled basis between predetermined points or cities" is that, in order to qualify, a flight must operate on a regularly scheduled basis between the same predetermined points or cities.

Furthermore, the terms of the Service Agreement do not support Mrs. Smith's argument that her husband's flight was regularly scheduled. The Service Agreement mostly addresses safety requirements and the pricing of services. The only provision that deals with scheduling is:

> "Services. Upon Apache's request, Rotorcraft may, in its sole discretion, but shall not be obligated to, provide Apache with non-exclusive airport to offshore well platform transportation services via its Aircraft, or other Aircraft it may cause to be made available, as the parties may agree upon and which is deemed airworthy and in compliance with all federal and recommended safety guidelines. Air transportation services may include, but not be limited to: (i) Apache's routine offshore operations in the Gulf of Mexico including, but not limited to, crew shift changes, equipment and supplies transportation, and routine and emergency inspections of platforms, facilities, and drilling rigs; and, (ii) non-routine exploration and production activities in the Gulf of Mexico." (Emphasis in original.)

We note that the Service Agreement contains no mandatory provisions regarding scheduling. Even though the Service Agreement contemplates the use of Rotorcraft's services in certain "routine" matters, Rotorcraft was not obligated to provide its services to Apache. Similarly, Apache was not required to use Rotorcraft for its transportation needs. The result of this

13

arrangement was that any flights that were made under the Service Agreement must have been chartered on-demand. Therefore, the Service Agreement alone cannot constitute evidence that Rotorcraft operated Mr. Smith's flight on a regularly scheduled basis between predetermined points or cities.

Our analysis might perhaps be different if the Service Agreement had required Rotorcraft to transport Apache employees from Point A to Point B every Monday at eight o'clock in the morning. In that case, even if Rotorcraft had operated the flight under an FAR 135 certification, Mrs. Smith would have a had an argument that the flight met the "regularly scheduled . . . between predetermined points or cities" requirement of the "Common-Carrier Accident" definition.[6] But this is not that case. Mrs. Smith requested a continuance to discover evidence on this general issue and produced nothing.

Mrs. Smith bore the burden of establishing coverage under her policy. Dickerson, 556 F.3d at 295. In order to establish coverage, she had to satisfy the "regularly scheduled" requirement of the policy. She failed to produce any evidence that she could satisfy this requirement. Therefore, the district court erred in denying Aflac's motion for summary judgment and in granting her cross-motion. See Celotex, 106 S.Ct. at 2552.

CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and remanded with instructions that judgment be rendered that Mrs. Smith take nothing by her suit against Aflac.

REVERSED and REMANDED.

---

[6] We would then need to reach Aflac's other assignments of error.

14