# United States Court of Appeals for the Fifth Circuit

————————

No. 23-11247

————————

United States Court of Appeals
Fifth Circuit

**FILED**

September 17, 2024

Lyle W. Cayce
Clerk

Fonda Wicks,

*Plaintiff—Appellant*,

*versus*

Metropolitan Life Insurance Company,

*Defendant—Appellee*.

————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-1275

————————————————————

Before King, Stewart, and Higginson, *Circuit Judges*.

Per Curiam:[*]

Plaintiff-Appellant Fonda Wicks ("Wicks") appeals the district court's judgment in favor of Defendant-Appellee Metropolitan Life Insurance Company ("MetLife") upholding MetLife's denial of accidental death benefits after Wicks's husband died while recovering in the hospital from gastric sleeve surgery. For the reasons that follow, we AFFIRM the district court's judgment in favor of MetLife.

————————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-11247

## I. FACTUAL & PROCEDURAL BACKGROUND

The plaintiff-appellant in this case, Wicks, is the widow of decedent Jackie Wicks ("Mr. Wicks"). On June 24, 2021, Mr. Wicks was admitted to Lake Granbury Medical Center and underwent a robotic-assisted laparoscopic sleeve gastrectomy, commonly referred to as gastric sleeve surgery. At the time of the surgery, Mr. Wicks was sixty years old with a history of morbid obesity and obstructive sleep apnea. The gastric sleeve surgery was completed successfully without complications.

While in recovery, Mr. Wicks was prescribed several pain medications to be administered intravenously, including morphine, fentanyl, and hydromorphine, *i.e.*, Dilaudid. He received 50 micrograms of fentanyl at 11:02 a.m. and at 11:06 a.m. and 4 milligrams of morphine at 11:20 a.m. He was moved from the recovery unit to a hospital room at approximately 12:30 p.m. Once in his hospital room, he ambulated (or walked) up and down the hall with assistance, but he complained of pain, so he was given 1 milligram of Dilaudid. Wicks then left Mr. Wicks's room to get lunch and returned to find Mr. Wicks unresponsive and not breathing. At 1:38 p.m., a "Code Blue" was called, and hospital staff began to attempt life-saving procedures. At 1:40 p.m. Mr. Wicks was given 2 milligrams of Narcan, which is a medication administered to reverse the effects of narcotics, but the Narcan had no effect. He was then moved to the Intensive Care Unit. Mr. Wicks died two days later, on June 26, 2021.

Dr. Tara Pavelek pronounced Mr. Wicks dead and prepared the death certificate. According to the death certificate, the manner of death was "natural," and the immediate cause of death was "anoxic brain injury" resulting from "cardiac arrest" and "aspiration of gastric contents," with the underlying cause listed as "unintentional narcotic overdose." Dr. Pavelek also listed on the death certificate "morbid obesity" and "severe obstructive sleep apnea" as "significant conditions contributing to death but

2

not resulting in the underlying cause" of death. An autopsy report was subsequently prepared by Dr. Paul Radelat. The report provided that Mr. Wicks "[e]xhibited anatomical changes in the brain consistent with a recent hypoxic or anoxic episode. Absent other causes, this is considered the immediate cause of death."

Prior to his death, Mr. Wicks participated as a company employee in a COG Operating LLC Welfare Benefit Plan ("Plan"). Mr. Wicks's Plan is governed by the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. § 1001, *et seq.* MetLife is the administrator of the Plan. Wicks is the sole beneficiary of the coverages under the Plan.

Under the Plan's terms, Mr. Wicks was enrolled in basic life insurance, accidental death and dismemberment ("AD&D"), and voluntary AD&D coverage. Only the two AD&D provisions are at issue in this appeal. The insurance provisions for these coverages are essentially identical and provide:

> If You [or a Dependent][1] sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the SCHEDULE OF BENEFITS, Proof of the accidental injury and the Covered Loss must be sent to [MetLife]. When We receive such Proof We will review the claim. If We approve the claim, We will pay the insurance in effect on the date of the injury within 60 days of Our receipt of such proof.
>
> **Direct and Sole Cause** means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes.

---

[1] The phrase "or a Dependent" is the primary variation between the two AD&D coverage descriptions.

No. 23-11247

Under the Plan, "Proof" means written evidence, satisfactory to MetLife, that the claimant has satisfied the conditions and requirements for payment of any benefit described in the Plan, and "Covered Loss" includes "Loss of life."

Relevant herein, both AD&D coverages have two exclusion provisions: Exclusions 1 and 8. Exclusion 1, the "Illness/Treatment Exclusion," states that benefits will not be paid "for any loss caused or contributed to by: 1. physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity." Exclusion 8, the "Drug Exclusion," states that no benefits will be paid "for any loss caused or contributed to by . . . 8. the voluntary intake or use by any means of: any drug, medication or sedative, unless it is: taken or used as prescribed by a Physician."

After Mr. Wicks's death, Wicks filed a claim for the basic life insurance benefits payable under the Plan. In July 2021, MetLife paid the benefits to Wicks in accordance with the Plan's terms. Wicks also contacted MetLife about the AD&D benefits under the Plan but did not file an official claim for those benefits at that time. Instead, on October 7, 2021, Wicks filed a lawsuit against MetLife in the 355th Judicial District Court of Hood County, Texas. MetLife removed the lawsuit to federal court in November 2021. Then, on November 24, 2021, pursuant to MetLife's motion, the district court stayed the case to permit Wicks to exhaust her administrative remedies by submitting her claim to MetLife for the AD&D benefits under the Plan.

Once the court case was administratively closed, Wicks submitted her AD&D claim to MetLife. MetLife denied Wicks's AD&D claim in a letter dated March 9, 2022. In the denial letter, MetLife cited to the Plan's insuring provision, the "Direct and Sole Cause" provision, and the "Illness/Treatment Exclusion," and stated that, based on the terms of the

No. 23-11247

Plan and the facts in the administrative record, it had concluded that Mr. Wicks's death was not a covered loss under the AD&D provisions in the Plan. MetLife explained that:

> [T]he loss did not directly and solely result from an accidental injury. Rather, the death resulted from complications following surgery, which Mr. Wicks underwent to treat his morbid obesity. There is no indication of an accident, certainly not one that was independent of other causes. Consequently, the death was not a Covered Loss.

MetLife continued that:

> Even if an accident independent of other causes had occurred, which is not proven by the documents, the Plan excludes as a Covered Loss any loss which is caused or contributed to by physical illness or infirmity, or the diagnosis or treatment of such illness or infirmity. The facts here fall within this exclusion as Mr. Wicks'[s] death stemmed from his morbid obesity; his election to undergo surgical treatment to treat his morbid obesity; and the admission of hydromorphone to treat the related pain from the surgery. Clearly, Mr. Wicks'[s] physical condition and/or the medical treatment thereof caused or contributed to his death.

Following MetLife's initial denial letter, Wicks filed an administrative appeal, this time contending that Mr. Wicks's death was caused by a negligent overdose of prescription medications.

In a letter dated July 13, 2022, MetLife upheld its initial denial of Wicks's AD&D claim. In the second denial letter, MetLife again referenced the direct and sole cause provision, the illness/treatment exclusion, and the death certificate findings. MetLife then explained that it stood by its determination, stating that:

5

> [T]he loss was not a covered accident because it did not directly and solely result from an accidental injury. Rather, the loss was due to complications associated with medical treatment for obesity. Even assuming that Mr. Wicks'[s] loss falls within the covered accident provision, Accidental Death benefits are still not payable because the illness/treatment exclusion applies. Mr. Wicks'[s] obesity was a physical illness and when he underwent gastric sleeve surgery, he was receiving treatment to correct that illness. Further, the postoperative services that he received, which caused his death, were a necessary component of the gastric sleeve surgery. In short, Mr. Wicks died from his illness or as a direct result of medical treatment for his illness, which excluded the payment of Accidental Death benefits.

MetLife further provided the report of an independent medical expert, Dr. Michael Darracq, who had reviewed the medical documentation submitted by Wicks in support of her appeal. Based on his review of the documentation in the administrative record, Dr. Darracq stated that he could not conclude "with a reasonable degree of medical certainty that the loss [*i.e.*, Mr. Wicks's death] was solely due to an overdose of administered drugs." Dr. Darracq further opined that "[a]n overdose did not take place in the present case. The decedent received an appropriate dose of medication and suffered an event in a timeframe that would not [be] reasonably anticipated from the administered drug alone." Dr. Darracq concluded that Mr. Wicks:

> had the physical illness of obesity [and i]n the absence of this condition and the surgery that was performed to correct it, [Mr. Wicks] would not have received postoperative medications that may have been contributory to death. Therefore, the loss was contributed to by the physical illness of obesity and the surgical treatment of same.

With MetLife's denial of Wicks's administrative appeal, the district court lifted the stay, and the legal proceedings continued. Once the case was reopened, both Wicks and MetLife moved for summary judgment. MetLife alternatively moved for judgment on the administrative record.

On August 14, 2023, the district court denied both Wicks's and MetLife's summary judgment motions based on its conclusion that "summary judgment [was] not the appropriate vehicle for resolution of this case due to the prevalence of disputed issues of fact." The court then conducted a *de novo* review of the administrative record and upheld MetLife's denial of benefits to Wicks, agreeing that she had failed to carry her burden of establishing that she was entitled to AD&D coverage based on the terms of the Plan. In its Memorandum Opinion & Order, the district court summarized its decision as follows:

> [B]ecause the record shows that Mr. Wicks received an appropriate dosage of Dilaudid, the [c]ourt finds that Mr. Wicks received proper medical treatment. Since Mr. Wicks received proper medical treatment, the [c]ourt finds that his death was caused by the preexisting infirmity of obesity. Because Mr. Wicks died from obesity, his death did not result from "accidental injury, independent of other causes." As such, an "Unintentional Narcotic Overdose" is not the Direct and Sole Cause of Mr. Wicks'[s] death.

Given its holding that Wicks failed to show that the "unintentional narcotic overdose" was the "direct and sole cause" of Mr. Wicks's death, the district court declined to address Wicks's arguments related to the Plan's drug exclusion and the exception contained therein. Wicks filed this appeal.

## II. STANDARD OF REVIEW

ERISA provides federal courts with jurisdiction to review benefit determinations. *See Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d

246, 256–57 (5th Cir. 2018); 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . to recover benefits due to [a claimant] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."). Here, the district court conducted a *de novo* review of the administrative record under Federal Rule of Procedure 52(a). *See* FED. R. CIV. P. 52(a); *Ariana M.*, 884 F.3d at 256–57. Our review on appeal is also *de novo. See Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014); *Newsom v. Reliance Std. Life Ins. Co.*, 26 F.4th 329, 334 (5th Cir. 2022); *Miller v. Reliance Std. Life Ins. Co.*, 999 F.3d 280, 283 (5th Cir. 2021).[2]

On appeal, "we will not set aside the district court's factual findings unless they are clearly erroneous." *Newsom*, 26 F.4th at 334; FED. R. CIV. P. 52(a)(6). "This is a high standard, meaning [w]e will not conclude that a district court's finding of fact was clearly erroneous based only on our belief that, had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently and made a different finding." *Id.* at 335 (internal quotation marks and citation omitted). Thus, "[w]e will only reverse if a review of all the evidence leaves us with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks and citation omitted).

## III. DISCUSSION

---

[2] The district court determined that a *de novo* standard of review applied to MetLife's benefits denial based on this court's analysis in *Ariana M.*, 884 F.3d at 256–57, as well as various district court cases that have held that the Texas Insurance Code prevents application of ERISA's discretionary clause. Neither party disputes that the *de novo* standard of review applies on appeal. Moreover, because Wicks's claims still fail under the more lenient *de novo* review standard, it is unnecessary to analyze whether the abuse-of-discretion standard could apply herein.

On appeal, Wicks argues that when an insurer denies accidental death benefits due to obesity as violating the direct and sole cause clause, the death should "be naturally flowing from obesity or closely related to obesity." Additionally, Wicks makes the following five arguments related to the exception contained in the Plan's drug exclusion: (1) that she is entitled to benefits under the exception to the drug exclusion because Mr. Wicks died from an unintentional drug overdose after being administered narcotics that were prescribed by a physician at the hospital; (2) because the term "accident" is not defined in the Plan, the exception to the drug exclusion prevents the exclusion from applying or alternatively, a death resulting from a prescribed drug is designated an accident per the exception; (3) the Plan requires that the medical treatment be negligent for the drug exception to apply "unless it is taken or used as prescribed by a physician"; (4) there is an ambiguity between the Plan's drug exclusion and the exception thereto; and (5) there is an ambiguity between the Plan's "direct and sole cause" clause and the drug exclusion's exception.

MetLife counters that to be entitled to AD&D benefits, Wicks was required to prove that there was coverage under the Plan's insuring provision, *i.e.*, that the post-operative narcotics that were administered to Mr. Wicks were the direct and sole cause of his death. Because Wicks failed to meet this burden, MetLife urges, the district court did not err in upholding MetLife's denial of benefits. MetLife further contends that the district court did not err in declining to address the drug exclusion's exception because Wicks's AD&D claim was not covered under the terms of the Plan and an exception to an exclusion alone cannot create coverage. We agree with MetLife.

"ERISA's principal function [is] to protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (internal quotation marks and citation omitted). ERISA's statutory scheme is thus

"built around reliance on the face of written plan documents." *Id.* at 100-01 (citation omitted). "[A]n administrator must act in accordance with the documents and instruments governing the plan insofar as they accord with the statute[.]" *Id.* at 101. "The plan, in short, is at the center of ERISA." *Id.*

"Federal common law governs rights and obligations stemming from ERISA-regulated plans, including the interpretation of policy provisions[.]" *Green*, 754 F.3d at 331 (internal quotation marks and citation omitted). "When construing ERISA plan provisions, courts are to give the language of an insurance contract its ordinary and generally accepted meaning if such a meaning exists." *Green*, 754 F.3d at 331; *Newsom*, 26 F.4th at 334. "Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured." *Green*, 754 F.3d at 331; *Newsom*, 26 F.4th at 334–35.

As an initial matter, because Wicks is a claimant seeking benefits under an ERISA plan, she bears the burden of proving entitlement to those benefits. *See Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993). Beginning with the terms of the Plan, to obtain AD&D coverage, Wicks was required to show that Mr. Wicks "sustain[ed] an accidental injury that [was] the Direct and Sole Cause of a Covered Loss," with "Direct and Sole Cause" being defined as a "Covered Loss" that "was a direct result of the accidental injury, independent of other causes." Although Wicks was able to point to language in the death certificate that Dr. Pavelek concluded that Mr. Wicks's death was caused in part by the post-operative narcotics he received, Wicks failed to provide evidence that the narcotics were the "Direct and Sole Cause" of the "Covered Loss," *i.e.*, Mr. Wicks's death.

As the district court reasoned, it was not necessary for it to define the term "accident" in this case. Regardless of whether Mr. Wicks sustained an

"accidental injury" that was a "covered loss," Wicks failed to show that the covered loss was a direct result of an "accidental injury" that was "independent of other causes" (his morbid obesity). Consequently, she could not show entitlement to AD&D coverage because the terms of the Plan required that the accidental injury be the "direct and sole" cause of the covered loss. As explained below, the district court's reasoning is supported by applicable caselaw as well as the medical expert reports and other evidence in the administrative record when read in the context of the terms in the Plan.

In support of its analysis regarding the direct and sole cause clause in the Plan, the district court pointed to Fifth Circuit precedent holding that "the standard complications of standard medical treatment" for obesity were the foreseeable result of treatment for the disease rather than a covered accident. *See Thomas v. AIG Life Ins. Co.*, 244 F.3d 368, 369–70 (5th Cir. 2001) (quoting *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050, 1053 (7th Cir. 1991)). In *Thomas*, this court evaluated a case factually similar to the one herein where the decedent suffered from morbid obesity, had two stomach stapling surgeries to treat his disease, and ultimately died from sepsis after his sutures ruptured following his second surgery. *Id.* at 369. There, the panel explained that there was no "principled basis on which to disassociate [the decedent's] iatrogenic injury from the disease complications of his obesity," ultimately concluding that "his death was the foreseeable result of treatment for his disease." *Id.* at 370. On those grounds, the panel concluded that "the plan administrator did not abuse its discretion in finding that [the decedent's] injury was attributable to a disease rather than an accident under the accidental death policies." *Id.* In reaching its conclusion, the panel relied on the Seventh Circuit's reasoning in *Senkier* explaining that when death results because proper medical treatment is unsuccessful, the death is caused by the preexisting infirmity. *See Senkier*, 948 F.2d at 1053 ("When you die from the standard complications of

standard medical treatments you don't, it seems to us, die in or because of an accident; your death is the result of illness.").

The panel's reasoning in *Thomas* is persuasive here given that both cases involved decedents with preexisting infirmities of morbid obesity that underwent surgery to treat their diseases and subsequently suffered post-operative complications after receiving proper medical treatment that resulted in their deaths. Moreover, because *Thomas* is also controlling circuit precedent, it was reasonable for the district court to rely on it in reaching its conclusion that Wicks failed to show that an accidental injury was the "sole and direct cause" of Mr. Wicks's death due to his preexisting infirmity of morbid obesity. Additionally, given the *Thomas* panel's adoption of the Seventh Circuit's reasoning in *Senkier*, the district court was also entitled to conclude that because Mr. Wicks received proper medical treatment and death nevertheless resulted, his death was caused by the preexisting infirmity of his obesity. *See Senkier*, 948 F.2d at 1053.[3]

In further support of its analysis, the district court cited to *Koch*, a district court case where the court addressed the same "Direct and Sole Cause" clause that is at issue in Wicks's case. *See Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 744 (N.D. Tex. 2019). There, the district court noted that there was evidence presented which showed that the decedent's death was caused by a fall but there was also evidence showing that his death was

_____

[3] Although Wicks takes issue on appeal with the district court's reliance on caselaw to aid in its interpretation of the Plan provisions, her position is unfounded as this court has consistently held that "[f]ederal common law governs rights and obligations stemming from ERISA-regulated plans, including the interpretation of policy provisions[.]" *Green*, 754 F.3d at 331 (internal quotation marks and citation omitted). We further reject Wicks's argument that Mr. Wicks was entitled to receive copies of the potential cases relied on by the district court before purchasing the Plan. Wick points to no statutory or other legal authority in support of her argument, nor would any such requirement be feasible given that caselaw by its nature is constantly evolving.

caused by a heart attack. *Id.* at 751. For that reason, the district court determined that the claimant failed to carry her burden of establishing entitlement to accidental death benefits under the ERISA plan because she could not show that the decedent's fall was the "direct and sole cause" of his death. *Id.*

Although not controlling, the district court's reasoning in *Koch* is persuasive here given the factual similarities between the two cases, *i.e.*, both cases featured two potential causes leading to the decedent's death and thus, neither one could be considered the "direct and sole cause" of the death. It is irrelevant that the two potential causes of the decedent's death in *Koch* (a heart attack and a fall) were different from the two potential causes of death in Wicks's case (a preexisting infirmity of morbid obesity and post-operative narcotics). Simply put, the reasoning in *Koch* supports the conclusion that when evidence is presented of two potential causes, the claimant must show that the covered cause (the accidental injury) was the direct and sole cause of the loss (the decedent's death) to obtain the AD&D coverage. This is something that, like the claimant in *Koch*, Wicks was unable to do. Thus, the district court did not err in partially relying on the reasoning in *Koch* to conclude that Wicks failed to carry her burden of establishing that Mr. Wicks's death was caused solely and directly by an accidental injury, given his preexisting infirmity of morbid obesity. *Id.*

The record further reveals that the district court did not solely rely on the *Koch* and *Thomas* cases in reaching its determination that Wicks failed to show her entitlement to AD&D benefits under the Plan. It also relied on the report of Dr. Darracq, MetLife's medical expert, who stated that he could not conclude "with a reasonable degree of medical certainty that the loss [*i.e.*, Mr. Wicks's death] was solely due to an overdose of administered drugs." Indeed, Dr. Darracq went so far as to opine that there was no overdose at all in this case, stating that "[t]he decedent received an appropriate dose of

medication and suffered an event in a timeframe that would not [be] reasonably anticipated from the administered drug alone." As the district court noted, Dr. Darracq also observed that Mr. Wicks "had the physical illness of obesity [and i]n the absence of this condition and the surgery that was performed to correct it, [he] would not have received postoperative medications that may have been contributory to death. Therefore, the loss was contributed to by the physical illness of obesity and the surgical treatment of same."

We agree that Dr. Darracq's expert report adequately supports the district court's determinations that: (1) Mr. Wicks received an appropriate dosage of Dilaudid, and thus received proper medical treatment; (2) given that Mr. Wicks received proper medical treatment, his death was caused by the preexisting infirmity of obesity; and (3) because Mr. Wicks died from obesity, his death did not result from "accidental injury, independent of other causes." Consequently, it was reasonable for the district court to conclude under *Thomas* that, because the standard complications of standard medical treatment for obesity were the foreseeable result of treatment for his disease rather than a covered accident, Wicks was not entitled to AD&D coverage under the plan. *See Thomas*, 244 F.3d at 369–70 (quoting *Senkier*, 948 F.2d at 1053). Moreover, as the district court accurately observed, although Wicks submitted evidence of several other medical experts involved in the case (Drs. Belott, Zheng, Radelat, and Pavelek), the reports and documentation submitted by these doctors did not controvert or dispute Dr. Darracq's findings. In other words, none spoke to the issue of whether the post-operative narcotics were the direct and sole cause of Mr. Wicks's death,

nor did they contradict Dr. Darracq's conclusion that Mr. Wicks's morbid obesity, not the narcotics, was the underlying cause of his death.[4]

In light of the above analysis, we conclude that there is no merit to Wicks's argument on appeal that when an insurer denies accidental death benefits due to obesity as violating the direct and sole cause clause, the death should "be naturally flowing from obesity or closely related to obesity." Her argument not only misconstrues the applicable law, it also misinterprets the district court's holding as it relates to the terms of the Plan.

Finally, although the record indicates that MetLife cited to the illness/treatment exclusions under the Plan in both of its denial letters to Wicks, the district court declined to address the exclusions in the proceedings below based on its finding that Wicks failed to show that coverage existed under the terms of the Plan in the first place. On appeal, MetLife supports the district court's decision not to address the exclusions and argues that because Wicks has failed to show entitlement to AD&D coverage under the terms of the Plan, she likewise cannot show entitlement to AD&D coverage through any of the Plan's exclusions or exceptions thereto. Wicks, on the other hand, devotes five of her six arguments on appeal to a discussion of the exclusions in the Plan, arguing that the prescription drug exception to the illness/treatment exclusions shows that her AD&D claims are covered under the terms of the Plan. Her arguments, however, do not survive under our longstanding precedent.

---

[4] As the district court pointed out, Wicks "provide[d] no competent expert testimony showing that the doctor inappropriately prescribed an excessive amount of Dilaudid or that the nurses failed to follow the prescription."

As this court has consistently held, "an exclusion cannot create coverage that would not otherwise exist under a policy." *See Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 112 (5th Cir. 2008) (citing *United Nat'l Ins. Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 452–53 (5th Cir. 2007)); *see also Sw. Airlines Co. v. Liberty Ins. Underwriters, Inc.*, 90 F.4th 847, 855 (5th Cir. 2024) ("[A] policy's main insuring clause sets the boundaries of coverage while its exclusions 'subtract' from that coverage."). For this reason, a claimant is required to establish that a claim is covered under the insuring clause of the policy before exclusions or exceptions can be invoked. *See Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, 2021 WL 4269565, at *5 (5th Cir. Sept. 20, 2021) (unpublished) (citing *Mary Kay Hldg. Corp. v. Fed. Ins. Co.*, 309 F. App'x 843, 850 n.5 (5th Cir. 2009) (unpublished) ("[E]xceptions to exclusions do not, in themselves, yield insurance coverage.")).

Here, because the administrative record and applicable law support the district court's determination that Wicks failed to carry her burden of establishing her entitlement to AD&D coverage under the terms of the Plan, the district court did not err in declining to address her arguments on these issues. For the same reasons, we reject her arguments on appeal that she is entitled to coverage through one or more of the Plan's exclusions, or exceptions thereto. *See Columbia Cas. Co.*, 542 F.3d at 112 (citing *United Nat'l Ins. Co.*, 497 F.3d at 452–53); *see also Smith v. Am. Family Life Assurance Co. of Columbus*, 584 F.3d 212, 218 (5th Cir. 2009) ("In the insurance context, an 'exclusion' is a 'provision that excepts certain events or

No. 23-11247

conditions from [previously established] coverage.'" (quoting BLACK'S LAW DICTIONARY (8th ed. 2004))).[5]

In sum, the terms of the Plan, the administrative record, and the applicable law adequately support the district court's holding that Wicks failed to carry her burden of proving that an "accidental injury" was the "direct and sole cause" of Mr. Wicks's death. Accordingly, we affirm the district court's judgment upholding MetLife's denial of AD&D coverage in this case.[6]

## IV. CONCLUSION

The district court's judgment is AFFIRMED.

––––––––––––––––––––––––––

[5] For these reasons, we also decline to address Wicks's arguments that an ambiguity exists between the drug treatment exception and exclusion thereto and that another ambiguity exists between the direct and sole cause clause and the language in the drug treatment exception. Because she is again relying on arguments relating to one of the exceptions to the exclusions in the Plan to support her position regarding resolving ambiguities in favor of the insured, and it has been affirmatively established herein *supra* through controlling precedent that she cannot show entitlement to coverage through the Plan's exclusions or exceptions thereto, we need not address the issue further. For the same reason, it is unnecessary that we address her argument that there is a public policy against drug exclusions and/or exceptions thereto.

[6] We also note that Wicks makes a number of miscellaneous arguments throughout her brief on appeal such as: (1) the district court added terms not in the Plan and failed to interpret and give meaning to the relevant clauses in the Plan; (2) the district court failed to define "accident or accidental injury" in the Plan; and (3) Mr. Wicks's accidental injury was anoxic brain injury, and the covered loss was death, so the brain injury was the sole and direct cause of the death. In light of our conclusion that the district court did not err in holding that Wicks failed to carry her burden of proving that an "accidental injury" was the "direct and sole cause" of Mr. Wicks's death, it is unnecessary that we address her additional miscellaneous arguments herein.